39 A.3d 105

Tuan Pingeran HAJIREEN,

v.

STATE of Maryland.

No. 232, Sept. Term, 2011.

Court of Special Appeals of Maryland.

March 2, 2012.

538

Anne K. Olesen (Paul B. DeWolfe, Public Defender, on the brief), Washington, DC, for Appellant.

Gary E. O'Connor (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: DEBORAH S. EYLER, GRAEFF, and WATTS, JJ.

GRAEFF, J.

Tuan Pingeran Hajireen, appellant, was accused of sexually assaulting J.M., an eight-year-old girl.[1] A jury sitting in the

---

1. We will identify the victim and her mother by initials to protect the victim's privacy.

Circuit Court for Montgomery County found him guilty of a third-degree sexual offense. The court imposed a sentence of seven years, all but two suspended, to be followed by supervised probation. Appellant additionally was required to register as a sex offender.

Appellant presents five questions for our review,[2] which we have consolidated and rephrased as follows:

1. Did the circuit court err when it admitted a recorded interview between a social worker and the victim?

2. Did the circuit court err when it declined to give a "missing evidence" instruction to the jury with respect

---

2. Appellant's questions are as follows:

I. Whether the trial court erred by admitting, for rehabilitation under Rule 5–616(c)(2), the child victim's hearsay statements from a videotaped interview with a social worker where the statements were inconsistent with the child's in-court testimony in the exact same manner as the prior inconsistent statements used to impeach her.

II. Whether the trial court erred by admitting, for substantive use and to rebut a charge of fabrication under Rule 5–802.1(b), the child's recorded hearsay statements where the rule did not apply.

 a. Whether the trial court erred because Rule 5–802.1(b) did not apply where the prior statement was inconsistent with the child's in-court testimony.

 b. Whether the trial court erred because Rule 5–802.1(b) did not apply where the defense made no charge of fabrication.

 c. Whether the trial court erred because Rule 5–802.1(b) did not apply where any hypothetical fabrication necessarily arose before the child's interview with the social worker.

III. Whether the trial court erred by admitting, without a stated hearsay exception, a social worker's hearsay statements from a videotaped interview with the child victim, where her method of questioning amounted to statements of implied belief in the child's credibility and the social worker was not called to testify.

IV. Whether the trial court erred by admitting a videotaped interview between the child victim and a social worker, where its relevance was substantially outweighed by a risk of prejudice because it repeated the child's account without challenge, the social worker implied her belief in that account, and the visual setting of the interview enhanced the jury's sympathy for the child.

V. Whether the trial court erred when it refused to give a requested missing evidence instruction after the State introduced a recording of Mr. Hajireen's contested police interrogation that was missing its audio component.

to a recording of a police interview of the appellant that was missing the audio component?

For the reasons set forth below, we shall reverse the judgment of the circuit court and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 20, 2010, appellant was indicted on one count of committing a sexual offense in the third degree. Trial commenced on January 11, 2011. During opening statement, defense counsel told the jury that appellant's "nightmare" began on July 18, 2010, "when, for some reason unknown to [appellant], myself, unknown to anybody . . . [J.M.] tells her mother" that appellant molested her. Counsel told the jury that the jury's task was "to prove that something didn't happen, to corroborate it with other evidence, to verify the word of a child, whose motives are unknown to us."

The victim's mother, Ms. M., testified that appellant met J.M.'s family at a religious holiday celebration in 2008 or 2009. After they met, appellant spent a significant amount of time at the family home. Although appellant's presence made Ms. M. uncomfortable, he would visit the family home a few times a week, and, at one point, he visited "almost every night." The children enjoyed spending time with appellant.

J.M. testified that, one night in March 2010, she, her sister, and appellant were playing a game of hide-and-seek. After they finished playing, J.M. went upstairs to prepare for bed. She went back downstairs for a glass of water and appellant, who was alone in the living room, called her over and asked her to sit on his lap. She complied, facing away from him. Appellant then placed one of his hands under her shirt on her stomach and the other hand in her pants, underneath her underwear. J.M.'s testimony about the incident continued as follows:

[THE STATE]: Okay. Did you ever know or feel if he put his finger or any part of his hand inside of you or whether it stayed on the outside of you?

[J.M.]: It stayed—put it inside.

[THE STATE]: Okay. Do you remember if he put one finger or more than one finger inside.

[J.M.]: I think it was one finger.

[THE STATE]: Okay. [J.M.], how long would you say his hand was inside your, your pants for?

[J.M.]: About five seconds.

[THE STATE]: And after five seconds what happened?

[J.M.]: He took it out.

[THE STATE]: Okay. And did anything happen right before he took it out?

[J.M.]: No.

[THE STATE]: After he took it out, was his other hand still on your stomach or did he move that hand?

[J.M.]: Moved that hand.

[THE STATE]: So, what happened after five seconds?

[J.M.]: My mom, she called, she called me to go upstairs.

[THE STATE]: And at that time, did you go upstairs?

[J.M.]: Yeah, I was trying.

[THE STATE]: What do you mean you were "trying"?

[J.M.]: I went upstairs and he called me again.

[THE STATE]: And then what?

[J.M.]: He did it again.

[THE STATE]: Okay. So, when you say "he did it again," did you ever get off of his lap or did you stay on his lap the whole time?

[J.M.]: On his lap the whole time.

[THE STATE]: Okay. So, how long a time was there between when he put his—took his hand out and put his hand back in? Do you remember? Was it like a minute or less?

[J.M.]: Maybe less.

\* \* \*

[THE STATE]: ... The second time he put his hand down your pants, where was his other hand?

[J.M.]: On ... my stomach.

[THE STATE]: And the second time, do you remember how long his hand was down your pants?

[J.M.]: About the same ... five seconds.

[THE STATE]: Five seconds. And that time did his hand move or stay the same?

[J.M.]: Move.

[THE STATE]: And did his finger stay on the outside or did it go inside?

[J.M.]: Inside.

[THE STATE]: Okay. And after five seconds what happened?

[J.M.]: My mom, she called me again.

[THE STATE]: And after she called you again, tell me what happened then.

[J.M.]: I went upstairs.

During cross-examination of J.M., defense counsel questioned her extensively about whether she told anyone about whether appellant "put his finger inside" her. J.M. testified that she told her mother, the police, and a social worker, Ms. Daryl Leach.[3]

Ms. M. testified that, in July 2010, J.M. told her what appellant had done in March, stating that appellant "put his hands in my pants." Ms. M. and her husband called the police and filed a police report. In response to defense counsel's questioning, Ms. M. stated that she did not tell the police that J.M. said that appellant put his finger inside of her.

Amy Krone, a member of the Montgomery County Police Department, conducted the initial investigation. Officer

---

3. J.M. did not remember Ms. Leach's name, but she responded to the question about "a lady in a small little room, and she had a board and was drawing pictures." J.M. initially stated that she could not recall Ms. Leach asking her that question, but she subsequently testified that she told Ms. Leach that appellant put his finger inside her.

Krone spoke with J.M., who told her that appellant asked her to sit on his lap and then "placed his hand inside of her underwear and rubbed her vaginal area with one hand and took his other hand and placed it on her stomach and rubbed her stomach area." J.M. became frightened and tried to get off appellant's lap. Appellant held her tighter, but he then released her after Ms. M. called for J.M. On cross-examination, defense counsel established that Officer Krone's report stated that J.M. "did not state that [appellant] penetrated her, only touched her private area." After her initial investigation, Officer Krone contacted detectives from the Family Crimes Division.

Detective Levi Renno, a member of the Montgomery County Police Department Family Crimes Division, Child Abuse Unit, conducted the investigation. He contacted a social worker, Daryl Leach, to interview J.M. He observed the interview, which was recorded.

On July 23, 2010, Detective Renno, along with Detective Chad Williams, arrested appellant and transported him to the Family Crimes Division. Appellant was able to speak English. After advising appellant of his Miranda rights, Detective Renno asked appellant what languages he spoke. Appellant responded that he spoke Tamil, Sinhalese, and English.[4] Appellant signed an Advice of Rights form and agreed to speak with the police.

Detective Renno began the interrogation by stating what J.M. had told them. Appellant initially acknowledged that he touched J.M.'s vagina, but he stated that it was accidental. After further questioning, appellant acknowledged that his touching of J.M. was intentional, and that he had touched J.M. under her underwear. He considered his conduct a lapse in

---

4. At the suppression hearing two months before trial, appellant testified that he is from Sri Lanka. At the time of his trial, he had been in the United States for over one year. His primary languages are Malay and Tamil, but he described himself as "[s]omewhat" fluent in English, clarifying that he struggles with complex vocabulary.

judgment, but he stated that his hand never went inside of her vagina. He apologized.

The detectives gave appellant the opportunity to write an apology letter to J.M., which he did. In the letter, appellant wrote: "I am so sorry for all this. Because we all make mistakes in life time. You are like my own grand children. I am so sorry if I hurt you. May Allah bless you. Tell mommy & daddy I am sorry. It's a big mistake."

Prior to their questioning of appellant, the detectives went to the audiovisual room to start the recording equipment. The recording equipment is activated by pushing a button and turning on the television monitor. Detective Williams could not remember who started the recording equipment, but Detective Renno testified that he was under the impression that his questioning of appellant was being recorded. After the end of the questioning, Detective Renno went to the audiovisual room and discovered that there was video, but no sound.[5]

The prosecutor then moved to admit a DVD recording of the interview between J.M. and the social worker, Ms. Leach. Defense counsel objected, arguing that the tape constituted hearsay, had no probative value because it was irrelevant, and was prejudicial. The prosecutor argued that the DVD did not

---

**5.** Detective Renno testified that the interview rooms in their office "are all wired for video and sound," and they record their interviews because "[i]t's a little better to hear what someone said and to see and hear it from their own mouth." He explained that they had "been having a lot of problems with" the recording equipment, but he was not aware of any problems with the interview room they used for appellant. He explained how he discovered the problem with the recording of appellant's interview:

What we do after the interviews is we'll go back into the audiovisual room, which I explained before, where we watch the interviews. There's a computer there that you can download. Basically, how it works is it's a digital recorder, just like a DVR at your house; it DVRs it off of the TVs there that are recording the interview room, and then from the DVR you can download it to the computer and then burn it onto a disk. And so when I downloaded it and burned it onto a disk, I just double-checked to, or I went to watch it and I saw that it had video but no sound.

contain inadmissible hearsay because the social worker made no statements during the interview and J.M.'s statements were admissible pursuant to Rule 5–802.1, the hearsay exception for prior consistent statements. He argued that the tape was relevant because the defense strategy was to undermine J.M. The court reserved ruling until it had the opportunity to view the DVD of the interview.

The next day, prior to the court viewing the DVD, defense counsel re-asserted his initial objections. He also argued that the testimony was cumulative, and if admitted, would allow the jury to view statements, which counsel characterized as largely replicating J.M.'s trial testimony, "over and over again." Defense counsel also argued, without elaboration, that the statement should not come in as a response to a charge of fabrication because the interview occurred after the motive to fabricate arose.

The court then viewed the videotaped interview, in which J.M. stated, consistent with her trial testimony, that appellant told her to sit on his lap, and he then put his hand in her pants, under her underwear.[6]

With respect to appellant's hand, the interview proceeded as follows:

Ms. Leach: Okay. Do you have any way to know if his hands were on the outside of your body but touching your skin, inside your body but touching your skin, or something else? Do you ... understand what I'm asking?

[J.M.]: No.

Ms. Leach: Okay. Let's see how I'm going to ask this so it makes sense. Okay. **When [appellant] was rubbing here, on the no-name part, you've described to me that it was on the outside, it was touching your skin but on the outside of your body. At any point, could you ... tell if**

---

**6.** We do not recite the entire portion of the recorded interview on the DVD that was played for the jury, but we note that it encompassed seven pages of trial transcript and lasted approximately eight minutes.

his, any part of his hand went inside your body when the rubbing was happening?

[J.M.]: **No.**

Ms. Leach: **No, okay. Are you sure?**

[J.M.]: **Yeah.**

Ms. Leach: Okay. All right. On the rubbing part, the no-name part ... could you tell if his fingers were doing—this is a really weird question, okay—could you tell if his fingers were like doing the same thing or were some of his fingers doing different things when the rubbing—

[J.M.]: They were doing the same thing.

Ms. Leach: Same thing, okay. How about up here on your tummy?

[J.M.]: The same thing.

Ms. Leach: Okay. All right.

(Emphasis added).

After the tape ended, the court stated that "[t]his testimony is inconsistent with what she testified to at trial in material respects." The prosecutor responded that the court should admit the DVD as a prior consistent statement because "the totality of the statement is consistent with what [J.M.] testified to in court." Alternatively, the prosecutor argued that the statement was justified as rehabilitation, in response to her impeachment.

■ The court ruled as follows:

I believe that the, the tape is admissible for two separate reasons. First, I do believe it fulfills the requirements of 5–802.1 as that rule has been explicated by the Court of Appeals in *Holmes v. State,* 350 Md. 412 [712 A.2d 554 (1998) ], and by the Court of Special Appeals in *Hyman v. the State,* 158 Md.App. [618, 857 A.2d 1166 (2004) ], a decision by Judge Kenney.

The statements—the witness was, in my judgment, cross-examined, and it was clearly suggested to the jury that she's making up stories and has not been truthful in her recounting of the stories, either in front of the jury or on prior

occasions, and that, as a consequence, the evidence is admissible to rebut an implied or express charge of fabrication or motive. Here, frankly, it's not implied, it's express, and the declarant testified at trial and the declarant was subject to cross-examination about her statements.

I also find under 5–104 that the statements predated any motive to lie or any improper influence and certainly predated this trial, which is when the charge of fabrication was made.

As an independent alternative ground, which was the basis for the affirmance in *Holmes,* the statements are also admissible as a consistent statement to diminish the child's impeachment at trial under 5–616(c)(2). The witness was clearly impeached during her cross-examination, and as a consequence, the statements are usable by the State under that rule.

Now, here's the rub. If they are admissible as substantive evidence, they're just in. If they're admissible only for impeachment, upon request, I would give a limiting instruction. What I'm inclined to do in this case is, when I instruct the jury, tell them they're usable only for the purposes of rehabilitation and not for the truth of the matter.[7]

The court then addressed the relevancy of the evidence and balanced that against the potential prejudice in admitting the DVD into evidence:

I do find that the evidence is relevant. I disagree with the contention that was made yesterday that the statements do not have probative value. I find that they are relevant to the case.

I also find under 5–403 that the, the probative value of the evidence, in the context of this case and how the evidence has come in, outweighs the danger of unfair prejudice,

---

7. Prior consistent statements admitted into evidence pursuant to Rule 5–802.1(b) may be admissible as substantive evidence, but prior consistent statements admitted into evidence pursuant to Rule 5–616(c) are admissible, not as substantive evidence, but to rehabilitate the witness's credibility. *Thomas v. State,* 202 Md.App. 386, 395, 32 A.3d 503 (2011).

confusion of the issues, or misleading the jury. And I believe, in addition, that my, when I instruct the jury that it's—this is the shorthand version and not the longhand version—that it's only to be used by them under 5-616(c)(2), that, in addition, minimizes the prejudice, because I'll make it clear that the statements are not usable by them for the truth of the matter asserted.

So, although I'm not required, necessarily, to state on the record that I've done the balancing[,] the Court of Appeals has indicated in lots of cases, including *Streater v. State*, that they would prefer so they don't have to indulge in the *Chaney v. State* presumption, which sort of is the fallback of "when, there's nothing else to do, we're going to assume the trial judge was not a complete idiot," which is not always a good assumption, so there it is. It may be right, it may be wrong, but there it is.

The State then played the DVD for the jury. The DVD was approximately eight minutes.

The State then rested its case. Defense counsel made a motion for judgment of acquittal, asserting a "lack of sufficiency of the evidence based on the contradictory statements of the victim in the case." The court denied the motion, and the defense rested.

In its instructions to the jury, the court, consistent with its evidentiary ruling, instructed the jury that the DVD evidence was admissible only regarding the victim's credibility. It instructed:

This morning I allowed you to watch a videotape, a DVD of statements made by the child earlier in the matter. This testimony was permitted only to help you decide whether or not to believe the testimony that the child gave at trial. It is for you to decide whether or not to believe the trial testimony of the child in whole or in part, but you may not use her earlier statement—that is to say, what you saw on the TV monitor—for any purpose other than to assist you in making that decision.

During closing argument, defense counsel told the jury that J.M.'s allegations were not credible. Specifically, he stated:

Usually, if someone is not telling the truth, fibbing, fabricating lying, whatever you want to call it, there's usually a reason. [Appellant] doesn't know the reason. I don't know the reason. Maybe there is no reason. Maybe it's just something children do. . . . She walked in here, she was awfully cute, and you know, when a 9-year-old girl walks in, tells you something, you really want to believe her because she's cute. You don't know nothing about her, but she says something and that something was a little shady, and you want to believe her. And, apparently, some people did believe her, and now the prosecutor wants you to believe her. But why can't we believe her? And I'll tell you why.

Counsel then stated that J.M. "downright fabricated, fibbed, and told a falsehood" when she testified that she told her mother, the police, and the social worker that appellant put his finger inside her.

During deliberations, the jury submitted a note to the court, asking: "Does 3rd degree require penitration [sic]." After discussing the note with counsel, the circuit court answered: "No." [8] Shortly thereafter, the jury returned with a guilty verdict.

On March 28, 2011, appellant filed a timely notice of appeal.

## DISCUSSION

### I.

### Admissibility of Prior Inconsistent Statements

Appellant's first contention involves the admission of a DVD containing J.M.'s prior statements to the social worker. Ap-

---

8. A third degree sexual offense is defined, in pertinent part, as "engag[ing] in sexual contact with another if the victim is under the age of 14 years, and the person performing the sexual contact is at least 4 years older than the victim." Md.Code (2002, 2010 Supp.) § 3–307(a)(3) of the Criminal Law Article ("C.L."). Sexual contact is defined as "an intentional touching of the victim's or actor's genital, anal, or other intimate area for sexual arousal or gratification, or for the abuse of either party." C.L. § 3–301(f)(1).

pellant asserts several grounds of error. Initially, he contends that the recording contained inadmissible hearsay statements by J.M. He further contends that the DVD contained hearsay statements by the social worker, asserting that her "mode of questioning" included statements that repeated and reinforced J.M.'s previous answers and "implicitly asserted that [J.M.] was telling the truth." Finally, appellant contends that the decision to admit the recorded interview constituted reversible error "[b]ecause its risk of prejudicial effect substantially outweighed its relevance."

The State contends that the trial court properly admitted a portion of the recorded interview. It asserts that J.M.'s recorded statements were properly admitted as an exception to the hearsay rule pursuant to Maryland Rules 5–616(c)(2) and 5–802.1. It argues that the social worker's questioning was not hearsay and "did not constitute an implied assertion or a statement of belief in [J.M.'s] credibility." Finally, the State contends that the circuit court "properly exercised its discretion in balancing probative value and prejudice" and properly admitted the taped statement with a limiting instruction.

A ruling on the admissibility of evidence ordinarily is within the trial court's discretion. *Blair v. State*, 130 Md.App. 571, 592, 747 A.2d 702 (2000). This Court generally reviews such rulings for an abuse of discretion. *State v. Simms*, 420 Md. 705, 724–25, 25 A.3d 144 (2011). "An abuse of discretion occurs 'where no reasonable person would take the view adopted by the [trial] court,' or when the court acts 'without reference to any guiding rules or principles.'" *Brass Metal Prods. v. E–J Enters.*, 189 Md.App. 310, 364, 984 A.2d 361 (2009) (quoting *King v. State*, 407 Md. 682, 697, 967 A.2d 790 (2009)).

Although the decision whether to admit a prior consistent statement falls within the discretion of the trial court, there are certain limits to when such evidence is admissible. The Court of Appeals has made clear that, "[a]s a general rule, prior out-of-court statements by a witness that are consistent with the witness's trial testimony are not admissible

to bolster the credibility of a witness." *Holmes,* 350 Md. at 416–17, 712 A.2d 554. *Accord Thomas v. State,* 202 Md.App. 386, 395, 32 A.3d 503 (2011) (general rule that prior consistent statements are not admissible merely as corroborative evidence). There are exceptions to this general rule, which are set forth in Md. Rule 5–802.1 and Md. Rule 5–616(c)(2), but there are specific requirements that must be met to fall within the ambit of these rules.[9] We turn to address these requirements.

## A.

### Maryland Rule 5–802.1

Maryland Rule 5–802.1 provides, in part, as follows:

The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:

\* \* \*

(b) A statement that is consistent with the declarant's testimony, if the statement is offered to rebut an express or implied charge against the declarant of fabrication, or improper influence or motive[.]

In *Holmes,* 350 Md. at 417, 712 A.2d 554, the Court of Appeals addressed whether this Rule retained the common law "premotive" rule, *i.e.,* that if a witness is attacked by a charge of fabrication or improper influence or motive, the prior consistent statement is relevant only if it was made *before* the source of the fabrication or improper influence or motive originated.[10] The Court of Appeals held that the Rule

---

**9.** "The Maryland Rules of Evidence, codified as Title 5 of the Maryland Rules, took effect July 1, 1994." *Blair v. State,* 130 Md.App. 571, 593, 747 A.2d 702 (2000).

**10.** For example, in *Finke v. State,* 56 Md.App. 450, 493, 468 A.2d 353 (1983), *cert. denied,* 469 U.S. 1043, 105 S.Ct. 529, 83 L.Ed.2d 416, 299 Md. 425, 474 A.2d 218 (1984), this Court addressed the need to rehabilitate a witness based on an asserted incapacity to remember.

did contain a "premotive" requirement, and a prior inconsistent statement is admissible pursuant to Rule 5–802.1(b) only if it was made prior to the alleged fabrication or improper motive. *Id.* at 424, 712 A.2d 554.

■ Here, the trial court found that J.M.'s prior statements to the social worker were admissible pursuant to Rule 5–802.1 because defense counsel suggested to the jury that J.M. was making up stories, and therefore, the evidence was "admissible to rebut an implied or express charge of fabrication." Defense counsel's argument, however, was that, for reasons unknown, J.M. made up the entire incident, from the beginning when she told her mother. J.M.'s subsequent statements to the social worker, therefore, were not made prior to the time the alleged, but unexplained, bias originated. Because her statements were not made "premotive," they were not admissible pursuant to Rule 5–802.1.

## B.

### Maryland Rule 5–616(c)(2)

The trial court ruled, in the alternative, that J.M.'s statements on the DVD were admissible pursuant to Rule 5–616(c)(2). That Rule provides:

(c) **Rehabilitation.** A witness whose credibility has been attacked may be rehabilitated by:

\* \* \*

(2) Except as provided by statute, evidence of the witness's prior statements that are consistent with the witness's present testimony, when their having been made detracts from the impeachment.

Prior consistent statements admitted pursuant to Rule 5–616(c)(2) are not admissible as substantive evidence, but rath-

---

We held that, where a witness was impeached by a suggestion of fabrication due to the inability to remember events years earlier, it was proper to rehabilitate the witness with consistent statements made several weeks after the event. *Id.*

er, they are admissible to rehabilitate a witness' credibility. *Thomas,* 202 Md.App. at 395, 32 A.3d 503.

As this Court has explained:

Prior consistent statements used for rehabilitation of a witness whose credibility is attacked are relevant not for their truth since they are repetitions of the witness's trial testimony. They are relevant because the circumstances under which they are made rebut an attack on the witness's credibility. Thus, such statements by definition are not offered as hearsay and logically do not have to meet the same requirements as hearsay statements falling within an exception to the hearsay rule.

*Blair,* 130 Md.App. at 595, 747 A.2d 702.

A review of Rule 5–616(c)(2) indicates that there are three prerequisites to admission of a prior statement as rehabilitation: (1) the witness' credibility must have been attacked; (2) the prior statement is consistent with the trial testimony; and (3) the prior statement detracts from the impeachment. We will address each of these factors.

 The first prerequisite is that the witness' credibility be attacked. A witness may be impeached in various ways, including by a showing of a prior inconsistent statement or a claim of fabrication. *Cole v. State,* 83 Md.App. 279, 298, 574 A.2d 326, *cert. denied,* 321 Md. 68, 580 A.2d 1077 (1990). Impeachment can occur from the nature of questioning or from suggestions of counsel in argument. *Craig v. State,* 76 Md.App. 250, 290–91, 544 A.2d 784 (1988), *rev'd on other grounds,* 316 Md. 551, 560 A.2d 1120 (1989).

There is no dispute here that J.M.'s credibility was attacked. Defense counsel impeached J.M.'s testimony at trial that appellant digitally penetrated her by extensively cross-examining her about whether she told anyone that detail, and then by eliciting testimony from Detective Krone and J.M.'s mother that J.M.'s initial statements did not include a claim that appellant penetrated her. And in opening statement, counsel stated that J.M. stated that appellant molested her

"for reasons unknown." Thus, J.M.'s credibility clearly was attacked.

The second requirement for admissibility pursuant to Rule 5–616(c)(2) is that the prior statement sought to be introduced be consistent with the trial testimony. Focusing on the issue of penetration, appellant contends that J.M.'s statements on the DVD were not consistent with her trial testimony. Although the State attempts to argue to the contrary, we agree with appellant on this point. At trial, J.M. testified that appellant put his finger inside of her and that she relayed that fact to the social worker. In J.M.'s statement to the social worker, however, when asked if she could tell if any part of appellant's hand went inside her body, she stated: "No." J.M.'s statement to the social worker, which was played for the jury on the DVD, was not consistent with her trial testimony on the issue of penetration.

The State argues, however, that our focus should not be so narrow. It contends that we should look to J.M.'s statements as a whole. It asserts:

The fact that the prior statement was consistent on the key points with her trial testimony meant that it detracted from the impeachment. That is, as she did at trial, in the prior statement she indicated that: it happened when [appellant] was on the couch in the living room; she sat on his lap; he put his hands "in my pants"; he "sticked his hand in"; his right hand was in her pants; he rubbed her stomach with his other hand; and she was wearing pajamas and underwear and his hand went under her underwear.

Since defense counsel focused so much on how the victim's statements changed over time, particularly at the time of trial, it was appropriate for the State to respond by pointing out how her statement closer to the time of the charged offense was consistent with her testimony at trial. [Defense counsel] argued that, since she allegedly was inconsistent about penetration, "why should we believe her about whatever else she says?" The narrowly focused prior statement, which was consistent with the victim's trial testi-

mony, detracted from that impeachment and was properly admitted.

To be sure, much of the prior interview played for the jury contained statements consistent with J.M.'s trial testimony. As the State notes, J.M. recounted that appellant asked her to sit on his lap, and he then placed his right hand in her pants, underneath her underwear, and he rubbed her stomach with his other hand.

To be admissible as rehabilitation, however, a prior consistent statement must be more than a repetition of the trial testimony; the statement must, under the circumstances in which it was given, "detract from the impeachment," Md. Rule 5–616(c)(2), or "rebut logically" the impeachment. *Holmes,* 350 Md. at 426 n. 3, 427, 712 A.2d 554 (quoting Reporter's Note, 125th Report of the Court of Appeals Standing Committee on Rules of Practice and Procedure, July 1993, at 86.) As the United States Court of Appeals for the First Circuit has stated, a prior consistent statement "must meet at least the standard of showing 'some rebutting force beyond the mere fact that the witness had repeated on a prior occasion the statement consistent with his trial testimony.'" *United States v. Simonelli,* 237 F.3d 19, 27 (1st Cir.) (quoting *United States v. Pierre,* 781 F.2d 329, 331 (2d Cir.1986)), *cert. denied,* 534 U.S. 821, 122 S.Ct. 54, 151 L.Ed.2d 23 (2001). *Accord United States v. Dennis,* 625 F.2d 782, 797 (8th Cir.1980) (request to introduce extrajudicial statements properly denied where prior consistent statements would be mere repetition to bolster witness' trial testimony). *See also Coltrane v. United States,* 418 F.2d 1131, 1140 (D.C.Cir.1969) ("Mere repetition does not imply veracity.").

Here, J.M.'s statements to the social worker did not detract from the impeachment beyond the fact that, on a prior occasion, she had repeated many of the details consistent with her trial testimony. With respect to the issue of digital penetration, as indicated, none of her statements to the social worker were consistent with her trial testimony on this issue. Nor do the statements in any way explain, clarify, or put in

perspective the inconsistency between J.M.'s trial testimony and her earlier statements, in which she made no assertion that appellant penetrated her.

Moreover, J.M.'s statements to the social worker did not "detract from" or "rebut logically" counsel's claim that J.M. made up the whole incident. The only "rebuttal value" the prior consistent statements had was the mere fact that she had repeated on an earlier occasion many of the statements she made at trial. The DVD, which included approximately eight minutes of the interview, was admitted to bolster the testimony of J.M. at trial. It did not otherwise detract from the impeachment pursuant to Rule 5–616(c)(2), and it was an abuse of discretion for the trial court to admit this evidence.[11] Appellant's conviction must be reversed.

## II.

### "Missing Evidence" Instruction

Although our disposition of the first issue renders it unnecessary for us to address the second issue presented, we will address it briefly for the benefit of the parties and the court in the event there is a retrial. Appellant's second issue addresses the fact that the audio portion of appellant's interrogation was not recorded due to an equipment malfunction or human error in activating the recording equipment.

Defense counsel contends that "the court erred in declining to give a missing evidence instruction due to the absence of audio on the video recording."[12] At trial, the prosecutor

---

11. The State does not argue that the admission of the evidence, if error, was harmless.

12. Defense counsel requested the following instruction:

Where there is a failure to electronically record an interrogation, you have not been provided with a complete picture of all of the facts surrounding the defendant's alleged statement and the precise details of that statement. By way of example, you cannot hear the tone or inflection of the defendant's or interrogator's voices, or hear first hand the interrogation, both questions and answers, in its entirety. Instead you have been presented with a summary based upon the

objected to such an instruction, stating that the evidence was not missing because "it's not that the audio at some point worked and, because of some fault of the police, it ceased to be." Instead, "[i]t never was there in the first place." In declining to give the missing evidence instruction, the court stated that the lack of an audio recording "was accidental, albeit sloppy," but its absence was "more hurtful to the State than" to appellant, and "an instruction regarding the spoilation or failure to preserve in this . . . case would create a clear danger of the jury giving undue weight to my comments."

 An appellate court reviews a trial court's decision not to grant a jury instruction under an abuse of discretion standard. *Gimble v. State,* 198 Md.App. 610, 627, 18 A.3d 955, *cert. denied,* 421 Md. 193, 25 A.3d 1026 (2011). The Maryland appellate courts have discussed the exercise of this discretion in the context of missing evidence instructions on several occasions.

In *Patterson v. State,* 356 Md. 677, 694, 741 A.2d 1119 (1999), the Court of Appeals held that a court generally is not required to instruct "on the presence or absence of most evidentiary inferences, including 'missing evidence' inferences." In that case, Patterson was convicted of possession of cocaine after the police found, in the trunk of his car, a jacket with crack cocaine in its pocket. *Id.* at 680–81, 741 A.2d 1119. The police did not collect the jacket as evidence, and the police did not know where it was at the time of trial. *Id.* at 681–82, 741 A.2d 1119. The Court of Appeals held that counsel was permitted to argue that the fact that the jacket was not collected by the State permitted an inference that the admission of the evidence would have been adverse to the State's case, but the trial court was not required to give such an instruction. *Id.* at 682, 741 A.2d 1119.

---

recollections of law enforcement personnel . . . . [sic] The absence of an electronic recording permits but does not compel you to conclude that the State has failed to prove that a statement was in fact given and if so, was accurately reported by State's witnesses.

In *Cost v. State,* 417 Md. 360, 369, 10 A.3d 184 (2010), the Court of Appeals reiterated that an appellate court generally reviews a trial court's decision not to grant a missing evidence instruction for an abuse of discretion. The Court found, however, that the facts in that case constituted an "exceptional circumstance" that compelled a missing evidence instruction. *Id.* at 378–79, 10 A.3d 184. The defendant in *Cost* was charged with crimes arising from the stabbing of a fellow prisoner in a prison cell. *Id.* at 363, 10 A.3d 184. The cell was cleaned by prison officials before it could be examined and none of the physical evidence was preserved. *Id.* at 366–67, 10 A.3d 184. The Court held that the missing evidence, blood stained clothing and blood on the cell floor, was "highly relevant evidence in [the State's] custody that it normally would have retained and submitted to forensic examination." *Id.* at 382., 10 A.3d 184 The missing evidence went "to the heart of the case," and the Court held that, given the facts of the case, the trial court abused its discretion in failing to give a missing evidence instruction. *Id.* at 380–81, 10 A.3d 184.

In *Gimble,* 198 Md.App. at 630, 18 A.3d 955, this Court noted that, pursuant to *Cost,* "[w]hen destroyed evidence was not central to the defense case, was 'not the type of evidence usually collected by the [S]tate, or [was] not already in the [S]tate's custody ... a trial court may well be within its discretion to refuse' to give a missing evidence instruction." (Quoting *Cost,* 417 Md. at 382, 10 A.3d 184). In that case, Gimble was convicted of drug charges stemming from drugs found in a backpack that flew out of Gimble's vehicle after his car crashed during a high-speed chase. *Id.* at 613–14, 18 A.3d 955. The backpack and other items were destroyed during a glitch in the Sheriff's Office routine annual purging procedure for evidence collected. *Id.* at 616–19, 18 A.3d 955. This Court held that, although the evidence was in police possession before it was destroyed, the trial court did not abuse its discretion in giving a missing evidence instruction. *Id.* at 632, 18 A.3d 955. We noted that, although the destroyed evidence was "potentially useful," it "was neither necessary nor central" to the appellant's defense. *Id.*

 The above cases all deal with situations where the State had evidence in its possession but did not preserve it. Here, as the State notes, the record does not reflect that it ever had an audio recording of appellant's interview. A missing evidence instruction, advising the jury that it could infer that the missing evidence would be unfavorable to the State, is not warranted in a situation where evidence was not destroyed, but rather, it was never created. *See United States v. Rose,* 104 F.3d 1408, 1417 (1st Cir.1997) (missing evidence instruction properly denied where, rather than failing to provide available evidence, the government merely failed to collect fingerprint evidence). *See also Metcalf v. Commonwealth,* 158 S.W.3d 740, 747 (Ky.2005) (court categorizes "equipment malfunction as a failure to *create* evidence to corroborate a confession rather than a failure to preserve" evidence).

Indeed, counsel did not request a typical missing evidence instruction. As indicated, the requested instruction was as follows:

> Where there is a failure to electronically record an interrogation, you have not been provided with a complete picture of all of the facts surrounding the defendant's alleged statement and the precise details of that statement. By way of example, you cannot hear the tone or inflection of the defendant's or interrogator's voices, or hear first hand the interrogation, both questions and answers, in its entirety. Instead you have been presented with a summary based upon the recollections of law enforcement personnel . . . . [sic] The absence of an electronic recording permits but does not compel you to conclude that the State has failed to prove that a statement was in fact given and if so, was accurately reported by State's witnesses.

Appellant cites no case that supports the proposition that such an instruction must be given. Under the facts presented here, we cannot conclude that it was an abuse of discretion to decline to give this instruction.

JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY REVERSED. CASE REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPIN-ION. COSTS TO BE PAID BY MONTGOMERY COUN-TY.