# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| | ) | |
| v. | ) | ID No. 1511017784A&B |
| | ) | |
| | ) | |
| BOBBY TAYLOR | ) | |

Submitted: August 11, 2023
Decided: August 16, 2023

## <u>MEMORANDUM OPINION AND ORDER</u>

*Upon Defendant Bobby Taylor's Motion for Postconviction Relief*,
**DENIED**.

Elizabeth R. McFarlan, Esquire and Andrew J. Vella, Esquire, Deputy Attorneys General, DEPARTMENT OF JUSTICE, Wilmington, Delaware, for the State of Delaware.

Christopher S. Koyste, Esquire, LAW OFFICE OF CHRISTOPHER S. KOYSTE, LLC, Wilmington, Delaware, for Bobby Taylor.

**WALLACE, J.**

Bobby Taylor has filed a motion under Superior Court Criminal Rule 61 seeking postconviction relief. Taylor's[1] sole complaint is that his trial counsel should have requested a *Lolly/Deberry*[2] instruction because the police never investigated nor generated a report explaining when and how Taylor's victim's cell phone got from the victim's car (where he was shot) to the nearby black top (where first-responders tried to save him).

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. THE FATAL NOVEMBER 27, 2015 SHOOTING OF ALOYSIUS TAYLOR.

On the morning of November 27, 2015, Taylor shot and killed Aloysius.[3] Taylor and Aloysius were both working at Shorty's Car Wash that morning when Taylor approached Aloysius (who was sitting in his own car), pulled out a gun, and fatally shot him.[4]

Immediately thereafter, Taylor fled.[5] He first went to his apartment and disposed of his unused bullets.[6] Thereafter, knowing he was wanted, Taylor

---

[1] Movant Bobby Taylor is of no known familial relation to his victim Aloysius Taylor. To avoid confusion, the Court will dispose of its customary use of honorifics and refer to Movant Bobby Taylor as "Taylor" and victim Aloysius Taylor as "Aloysius." Neither undue familiarity nor disrespect is intended.

[2] This shorthand for Delaware's criminal missing-evidence instruction jurisprudence is derived from the two state supreme court cases that are most-oft cited—*Lolly v. State*, 611 A.2d 956 (Del. 1992) and *Deberry v. State*, 457 A.2d 744 (Del. 1983).

[3] 9/25/19 Trial Tr. at 120, 164-65, 179 (D.I. 71).

[4] *Id.* at 88-90, 158-65, 179.

[5] *Id.* at 115-17.

[6] *Id.* at 117.

travelled between motels and friends' homes to evade capture.[7]

Taylor outran police in Delaware for approximately four months before deciding to leave the state and head South.[8] Taylor fled to Chattanooga, Tennessee, where he laid low for another year.[9] With the assistance of the United States Marshals Service, he was eventually arrested and brought back to Delaware.[10]

During the entirety of his nearly year-and-a-half-long flight, Taylor made no contact with the authorities or his car wash coworkers.[11] And when he was finally apprehended, he never uttered a word to police or anyone in law enforcement about his shooting of Aloysius.[12] Up until the defense opening statement of his trial, his version of what happened at the car wash and why he shot Aloysius remained a mystery to all but himself and his legal team.[13] That all changed in court.

## B. THE TRIAL

During the opening of his first trial, his lawyer finally revealed Taylor's

---

[7]  *Id.* at 178.

[8]  *Id.* at 178-80.

[9]  *Id.* at 180.

[10]  *Id.* at 68, 180.

[11]  *See id.* at 178-79.

[12]  *See State v. Taylor*, 2019 WL 4647669, at *2 (Del. Super. Ct. Sept. 23, 2019).

[13]  *See id.*

justification claim. And Taylor eventually testified on his own behalf in support thereof. It was then that he first admitted to shooting Aloysius, but insisted he did so in self-defense.[14] He said that as Aloysius sat in his car on the Shorty's lot that fatal morning, he (Aloysius) had a gun.[15] According to Taylor's telling, had he not shot Aloysius first, Aloysius would have shot him.[16]

Taylor told the jury that two nights prior to the car wash slaying, he had almost been shot himself while merely walking down the street.[17] So on the morning of November 27th, when Aloysius allegedly threatened—"We see that we didn't get your ass"—Taylor deduced Aloysius was part of the group that had shot at him earlier and that Aloysius wanted to kill him.[18]

To hear Taylor tell it, Aloysius—in those few fateful moments of November 27th—was motioning towards the center console of his car and attempting to pull out a black semiautomatic handgun.[19] Taylor says that's when he stepped back, pulled the gun he had armed himself with earlier that morning, and shot Aloysius.[20] During his trial testimony, Taylor was shown Aloysius's cell phone and asked

---

[14]  9/25/19 Trial Tr. at 108-16.

[15]  *Id.*

[16]  *Id.*

[17]  *Id.*at 99-102, 108-16.

[18]  *Id.* at 108-16.

[19]  *Id.* at 111-12.

[20]  *Id.* at 105-06, 112.

whether he believed the cell phone could have been what he claimed was the gun.[21] No, Taylor said: "I believed that he had a semiautomatic."[22]

No gun was ever found on or near Aloysius despite the fact others were tending to him within moments of Taylor's attack.[23] As best can be derived from the trial evidence, when Aloysius was removed from his car by those first-responding, the contents of his clothes' pockets and items in the driver's area were disturbed.[24] Those objects later found nearby included a cigarette pack, a lighter, and a cellphone.[25] All were collected by the police.[26]

In addition to Taylor's testimony, the jury heard from three witnesses who were present at the scene of the shooting: Robert Coates, Shawn Stanford, and Timothy Sawchuck. All were co-workers of Taylor's and Aloysius's.[27]

Robert Coates, Shorty's manager, testified that Aloysius and he were attempting to move an immobilized car; Mr. Coates was steering the disabled car while Aloysius used his own Ford Taurus to push it.[28] While Mr. Coates and

---

[21] *Id.* at 114.

[22] *Id.*

[23] *See id.*; *see* 9/24/19 Trial Tr. at 112-14 (D.I. 80).

[24] *See* 9/24/19 Trial Tr. at 61, 66, 112-14.

[25] *Id.* at 50; *see* Am. Mot. for Postconviction Relief Appendix ("PCR Appendix") at A23-A29 (D.I. 97 and D.I. 98) (pictures of Aloysius's belongings).

[26] *See* 9/24/19 Trial Tr. at 46.

[27] *Id.* at 75-77, 99.

[28] *Id.* at 102.

Aloysius were attempting this, Taylor approached Aloysius (who was sitting in the Taurus) and pointed a gun at him.[29]

Mr. Coates heard a sound and watched Taylor head away from Aloysius's car and into the car wash's office.[30] Mr. Coates went to the Taurus and saw that Aloysius had been shot.[31] When Mr. Coates was asked at trial, he answered "[n]o" to whether he saw "anything around [Aloysius] that looked like a gun."[32] Mr. Coates also told the jury that he immediately ran to a nearby gas station and flagged down a police officer for assistance.[33]

Shawn Stanford, another Shorty's employee, recounted that he heard a "loud boom," turned around to see Taylor walking toward the car wash office, and then went over to Aloysius who had been shot.[34]

Last, Timothy Sawchuck explained that he too heard a "pop" (which he first thought was car back-fire) and then saw Taylor "fast walking toward" the office.[35]

The first non-Shorty's employee on the scene was an Amtrak police officer, Brian Niedelman, whom Mr. Coates had flagged down immediately after the

---

[29] *Id.* at 102-05.

[30] *Id.* at 105-09.

[31] *Id.*

[32] *Id.* at 111-12.

[33] *Id.* at 109-10.

[34] *Id.* at 159-62.

[35] 9/25/19 Trial Tr. at 9.

shooting.[36]   Off. Niedelman testified that Mr. Coates had waved to him for assistance as he was driving by in his marked Amtrak police vehicle.[37]   When Off. Niedelman pulled over, he checked to see if the shooter (Taylor) was still present.  Then, he checked Aloysius for a pulse.  He found none.[38]

According to Off. Niedelman, "two to five minutes" after Mr. Coates flagged him down, medical and local police personnel arrived.[39]   Once the paramedics were on scene, Off. Niedelman and a paramedic removed Aloysius from the car and placed him on the ground, where CPR was performed.[40]  Aloysius didn't make it.

Approximately two-and-a-half hours after the shooting, Delaware State Police evidence technician Officer Roger Cresto arrived on the scene.[41]   Once on scene, Officer Cresto began taking pictures of the crime scene including Aloysius's belongings, which were lying on the black top "[a]pproximately 15 feet" from the car.[42]

Unsurprisingly, no one testified that they had paid any particular attention to

---

[36]   *See* 9/24/19 Trial Tr. at 36.

[37]   *Id.* at 36-37.

[38]   *Id.* at 38.

[39]   *Id.* at 39.

[40]   *Id.* at 38 ("I assisted, I believe, a paramedic in getting the gentleman out of the car to begin CPR.").

[41]   *Id.* at 60.

[42]   *Id.* at 49-55.

-7-

where Aloysius's phone or any of his other effects were when they saw him immediately after he was shot, nor how those items got to their resting place on the black top close by.

### C. TAYLOR'S VERDICT AND POST-CONVICTION MOTION.

After a three-day jury trial and an abbreviated bench trial, Taylor was found guilty of second-degree murder (as a lesser of the indicted murder in the first-degree count), possession of a firearm during the commission of a felony (PFDCF), and possession of a firearm by a person prohibited (PFBPP).[43] He was later sentenced to serve, *inter alia*, 30 years of imprisonment.[44]

Before docketing his present postconviction relief motion, Taylor filed a direct appeal of his conviction.[45] That appeal focused on this Court's September 23, 2019 judgment denying his motion to dismiss the indictment after granting an earlier mistrial.[46] The Delaware Supreme Court affirmed Taylor's conviction.[47] Thereafter, Taylor docketed a *pro se* motion for postconviction relief.[48] The Court appointed Taylor postconviction relief counsel who then filed an amended

---

[43]  9/26/19 Trial Tr. at 104 (D.I. 81); 9/27/19 Trial Tr. at 8 (D.I. 82).

[44]  D.I. 67 (Sentencing Order).

[45]  D.I. 68.

[46]  *See Taylor v. State*, 2021 WL 1227762, at *1 (Del. Mar. 31, 2021).

[47]  *Id.*

[48]  Mot. for Postconviction Relief (D.I. 88).

motion.[49]  Due to the nature of Taylor's claim, the record has been expanded.[50] The State has responded,[51] Taylor has replied,[52] the Court held argument on the motion, and the matter is now ripe for decision.

## II.  THE POSTCONVICTION MOTION

### A.  TAYLOR'S MOTION CAN BE CONSIDERED ON ITS MERITS.

Before the Court can consider the substance of any postconviction claim, it must first address Criminal Rule 61's procedural requirements.[53]  The procedural bars in Rule 61 are timeliness, repetitiveness, procedural default, and former adjudication.[54]

Here, Taylor's postconviction motion was filed less than a year after his judgment of conviction became final.  So, it's timely.  This is also Taylor's first motion for postconviction relief.  So, it's not repetitive.  And as Taylor's claim is alleging ineffective assistance of counsel—which generally can't be raised on direct appeal—he is neither procedurally barred from raising it in this collateral

---

[49]  Order Granting Appointment of Counsel (D.I. 91); Am. Mot. for Postconviction Relief (D.I. 96).

[50]  *See* Del. Super. Ct. Crim. R. 61(g); D.I. 95 (Amended Scheduling Order) ¶¶ 5-6; D.I. 100 (affidavit of trial counsel Eugene J. Maurer, Jr. Esq.); D.I. 101 (affidavit of trial counsel Elise K. Wolpert, Esq.).

[51]  State's Response (D.I. 102).

[52]  Reply Br. (D.I. 104).

[53]  *Maxion v. State*, 686 A.2d 148, 150 (Del. 1996); *State v. Jones*, 2002 WL 31028584, at *2 (Del. Super. Ct. Sept. 10, 2002).

[54]  *State v. Taylor*, 2017 WL 5054262, at *2 (Del. Super. Ct. Oct. 23, 2017). If any of these bars apply, then the movant must show entitlement to relief under Rule 61(i)(5). *Id.*

proceeding nor has it been formerly adjudicated.

Accordingly, the Court will address the merits of Taylor's postconviction claim.

## B. TAYLOR'S SOLE POSTCONVICTION CLAIM

Taylor complains his trial counsel was ineffective for failing to demand a *Lolly/Deberry* instruction[55] as "to the State's failure to gather and/or preserve evidence pertaining to Mr. A Taylor's cell phone, specifically who moved the cell phone at the scene of the crime from its initial location and the initial location it had been found before being moved."[56] Says Taylor, if his trial counsel had made that request, not only would the jury surely have received a missing-evidence instruction, it would have just as surely acquitted him of all but the PFBPP charge.[57]

## III. APPLICABLE LEGAL STANDARDS

A movant who claims ineffective assistance of counsel must demonstrate that: (a) his defense counsel's representation fell below an objective standard of reasonableness, and (b) there is a reasonable probability that but for counsel's

---

[55] *Coleman v. State*, 289 A.3d 619, 625 (Del. 2023) (explaining that under the *Lolly/Deberry* line of cases "the State's failure to gather or preserve evidence material to the defense entitles the defendant to an inference that, if such evidence were available at trial, it would be exculpatory" (citations omitted)).

[56] Am. Mot. for Postconviction Relief at 15-16.

[57] *Id.* at 16-35 ("In light of the aforementioned, the probability that had Mr. Taylor received a proper missing evidence instruction, the jury would have acquitted him on all four possible homicide charges. . . . Mr. Taylor would only have been convicted of PFBPP.").

-10-

errors, the result of the proceeding would have been different.[58]

There is a strong presumption that a criminal defense counsel's representation was reasonable.[59] When assessing the reasonableness of counsel's conduct, the Court considers "not what is possible or what is prudent or appropriate, but only what is constitutionally compelled."[60]

Too, one claiming ineffective assistance "must make specific allegations of how defense counsel's conduct actually prejudiced the proceedings, rather than mere allegations of ineffectiveness."[61]

Lastly, a movant must demonstrate *both* deficient attorney performance and resulting prejudice to succeed on his ineffective assistance of counsel claim.[62] Failure to do so on either will doom that claim and obviate any need for the Court to address the other.

---

[58] *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *see also Alston v. State*, 2015 WL 5297709, at *2-3 (Del. Sept. 4, 2015).

[59] *Green v. State*, 238 A.3d 160, 174 (Del. 2020) (explaining there is "a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance" (quoting *Strickland*, 466 U.S. at 689)).

[60] *Id.* (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

[61] *Alston*, 2015 WL 5297709, at *3 (citing *Wright v. State*, 671 A.2d 1353, 1356 (Del. 1996)); *Monroe v. State*, 2015 WL 1407856, at *5 (Del. Mar. 25, 2015) (citing *Dawson v. State*, 673 A.2d 1186, 1196 (Del. 1996)).

[62] *Strickland,* 466 U.S. at 694; *Ploof v. State*, 75 A.3d 811, 825 (Del. 2013) ("*Strickland* is a two-pronged test, and there is no need to examine whether an attorney performed deficiently if the deficiency did not prejudice the defendant." (citation omitted)); *State v. Hamby*, 2005 WL 914462, at *2 (Del. Super. Ct. Mar. 14, 2005).

## IV. DISCUSSION

### *TRIAL COUNSEL WEREN'T INEFFECTIVE WHEN THEY DID NOT SEEK A LOLLY/DEBERRY INSTRUCTION.*

Under *Strickland* and its progeny, "there is no need to examine whether an attorney performed deficiently if the deficiency did not prejudice the defendant."[63] "[I]f the court finds that there is no possibility of prejudice even if a defendant's allegations regarding counsel's representation were true, the court may dispose of the claim on this basis alone."[64] Here, the Court finds Taylor cannot possibly show prejudice from what he dubs deficient performance by trial counsel. So the Court will delve there first.

Again, Taylor's sole complaint is that counsel didn't ask for a *Lolly/Deberry* missing-evidence instruction targeting "the State's failure to gather and/or preserve evidence pertaining to Mr. A Taylor's cell phone, specifically who moved the cell phone at the scene of the crime from its initial location and the initial location it had been found before being moved."[65] If his trial counsel had made that request, says Taylor, "the jury would have acquitted him on all four possible homicide

---

[63] *Ploof*, 75 A.3d at 825 (citing *Strickland*, 466 U.S. at 697). *Strickland*, 466 U.S. 670 ("A court need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed.").

[64] *State v. Manley*, 2014 WL 2621317, at *7 (Del. Super. Ct. May 29, 2014).

[65] Am. Mot. for Postconviction Relief at 15-16.

charges" and he "would only have been convicted of PFBPP."[66]

Under *Lolly/Deberry* and their progeny, when the State fails "to gather or preserve evidence material to the defense" the defendant can seek to have the Court instruct the jury to "infer[] that, if such evidence were available at trial, it would be exculpatory."[67]

To determine whether a *Lolly/Deberry* instruction is warranted, the Court first asks three things:

(1) Would the requested material, if extant in the possession of the State at the time of the defense request, have been subject to disclosure under Criminal Rule 16 or *Brady v. Maryland*?[68]

(2) If so, did the government have a duty to preserve the material?

(3) If there was a duty to preserve, was the duty breached, and what consequences should flow from the breach?[69]

As explained most recently by our Supreme Court in *Coleman v. State*, the reading of a *Lolly/Deberry* missing-evidence instruction is limited to instances "where potentially exculpatory *physical* evidence was either not collected by law enforcement or collected but not preserved during the course of the prosecution."[70]

---

[66] *Id.* at 35.

[67] *Coleman*, 289 A.3d at 625 (citations omitted); *see also State v. Lindsey*, 2023 WL 2535895, at *8 (Del. Super. Ct. Mar. 16, 2023) (stating a *Lolly/Deberry* missing-evidence jury instruction is "an instruction that the jury should infer that any such . . . evidence would have been exculpatory to [the defendant] had the State obtained and preserved it" (citations omitted)).

[68] 373 U.S. 83 (1963).

[69] *Coleman*, 289 A.3d at 624-25.

[70] *Id.* at 626 (emphasis in original).

And when the Supreme Court has spoken of physical evidence it has meant, for example: "clothing worn during an alleged rape, a crash vehicle in a vehicular homicide case, blood observed near a boobytrapped window, or clothing concealing firearms that were the basis of criminal charges."[71] Recall, all the physical items that the police could associate with Aloysius were photographed *in situ* where the police first saw them. They were then each collected and preserved. But, according to Taylor, that's not where the police failed. And to get anywhere close to what *Lolly/Deberry* envisions (as explained in *Coleman*), Taylor engages a creative read of what is "physical evidence" and what it means to "gather" and "preserve" it.

Taylor insists officers had a duty to create a document or report on "who moved [Aloysius's] cell phone and where [the first-responders] originally observed the cell phone . . . ."[72] It is this non-existent investigative document, says Taylor, that "could easily have [been] gathered and preserved," and therefore warrants the missing-evidence instruction.[73]

---

[71] *Id.* (citing *Johnson v. State*, 27 A.3d 541, 547 (Del. 2011); *Deberry*, 457 A.2d at 753; *Hammond v. State*, 569 A.2d 81, 85 (Del. 1989); *Lolly*, 611 A.2d at 958).

[72] Am. Mot. for Postconviction Relief at 17 ("The information as to who moved the cell phone and where he or she originally observed the cell phone and from where he or she moved the cell phone and why was evidence that the State could easily have gathered and preserved through a report or other document memorialized by the individual or individuals who relocated the physical evidence at the crime scene.").

[73] *Id.* And Taylor tags the police as "grossly negligent" for not realizing the importance of this tracking of the phone's travel, and documenting how it may have gotten from the victim's person or car to the nearby black top. *Id.* at 19.

-14-

So, to Taylor: "gather" would mean to investigate certain aspects of an incident and create a police report; "physical evidence" would be that police report; and "preserve" would mean to hold onto the police-generated report because it just might have some as-yet unknown exculpatory value. The *Lolly/Deberry* lineage supports no such thing. Indeed, it seems Taylor wants this Court to do just that which our Supreme Court said it would not from the beginning.[74]

It is undisputed that Aloysius's cell phone itself was gathered and preserved. What was not gathered, complains Taylor, is information as to how the cell phone was purportedly moved from Aloysius's vehicle or person to the black top.[75] But, that is not physical evidence.

The physical evidence is Aloysius's cell phone, not its location—or more aptly here some investigation and memorialization of how the cell phone got from its apparent original placement within the victim's car to the ground nearby. If there was any possible *Lolly/Deberry*-recognizable evidence here it was the cell

---

[74]  *See Deberry*, 457 A.2d at 752 ("We do not purport to explicitly prescribe what administrative procedures are necessary for the Attorney General and the various law enforcement agencies in this State to fulfill the duty to preserve evidence.").

[75]  *See* Am. Mot. for Postconviction Relief at 19 ("It is unfathomable why law enforcement would not collect evidence of who moved each of these items and where they were originally located/observed.").

phone itself. And that is exactly what the police gathered and preserved.[76]

While Taylor himself notes that a missing-evidence instruction applies "to the State's failure to *gather* and/or *preserve* evidence,"[77] he attempts to divine some further requirement that evidence be *created*. And yet, Taylor himself admits he can identify no case—state or federal[78]—that has recognized such a requirement. Previous attempts to expand *Lolly/Deberry* in this way have been soundly rejected.[79] Taylor's now-suggested attempt would have fared no better at

---

[76] Even at its extreme "the duty to preserve exculpatory evidence does not include a duty to seek out exculpatory evidence." *Mason v. State*, 2009 WL 189839, at *1 (Del. Jan. 5, 2009). But that is what Taylor says is required. And even if he's right—which he's not—there was no reason to believe the original location of the cell phone was relevant—let alone exculpatory— and so there was no duty for police to investigate it. *Powell v. State*, 49 A.3d 1090, 1101 (Del. 2012) ("[F]or the police to have a duty to collect and preserve specific evidence, the police must have had a reason, at that time, to believe the evidence might be exculpatory.").

[77] Am. Mot. for Postconviction Relief at 15-16 (emphasis added). "[T]he State's failure to *gather or preserve* evidence material to the defense entitles the defendant to an inference that, if such evidence were available at trial, it would be exculpatory." *Coleman*, 289 A.3d at 625 (emphasis added) (citations omitted).

[78] D.I. 108.

[79] *Coleman*, 289 A.3d at 626-67 (rejecting defendant's contention that a missing-evidence instruction was required where police "fail[ed] to record the position of" the defendant's two firearm magazines in relation to the firearm itself); *Baynum v. State*, 133 A.3d 963, 967-69 (Del. 2016) (rejecting defendant's contention that officers had a duty under *Lolly/Deberry* to create evidence of a cell phone call that occurred outside of when officers were questioning the victim); *King v. State*, 2015 WL 5168249, at *3 (Del. Aug. 26, 2015) (finding a duty under *Lolly/Deberry* is not triggered where evidence "simply d[oes] not exist"); *Ruffin v. State*, 131 A.3d 295, 308 (Del. 2015) (finding *Lolly/Deberry* "only requires that the State adequately gather and preserve physical evidence," not test that physical evidence (citations omitted)).

Our sister courts, too, understand missing-evidence instructions are only to be used where evidence is actually lost or destroyed. *United States v. Fries*, 781 F.3d 1137, 1152 (9th Cir. 2015) (rejecting missing-evidence instruction where "the FBI agent merely failed to record the telephone call," and finding a missing-evidence instruction is only to be used where "evidence was lost or destroyed" (citation omitted)); *United States v. Flores*, 1991 WL 171394, at *14 (E.D. Pa. Aug. 29, 1991) (declining to give missing-evidence instruction where the government

-16-

his trial and certainly fares no better now.

Because Taylor would not have been entitled to a *Lolly/Deberry* missing-evidence instruction, he cannot show prejudice stemming from his trial counsel's failure to request one.[80] And his suggestion that had a missing-evidence instruction been given he certainly would have been acquitted of any homicide charge comes nowhere close to the reasonable probability *Strickland* requires.[81] Failure on the prejudice prong alone is enough to find Taylor didn't satisfy his burden under *Strickland*. But there's more. Taylor is equally unable to show counsel deficiency.

The burden is on Taylor to show that his counsel's conduct fell below an objective standard of reasonableness, "*i.e.*, that no reasonable lawyer would have

---

"failed to record some calls," and concluding that "no evidence was missing"), *aff'd*, 970 F.2d 900 (3d Cir. 1992); *Metcalf v. Commonwealth*, 158 S.W.3d 740, 747 (Ky. 2005) (finding a missing-evidence instruction was not warranted where the "recording device malfunctioned," since the evidence was neither lost nor destroyed, instead it "never existed"); *Hajireen v. State*, 39 A.3d 105, 119-20 (Md. Ct. Spec. App. 2012) (finding the State's failure to record the defendant's interview was not evidence for which a missing-evidence instruction would be warranted).

[80] *State v. Reyes*, 155 A.3d 331, 355 (Del. 2017) (finding that prejudice cannot be established where there is "no proper basis for giving a missing evidence instruction"); *Cook v. State*, 2000 WL 1177695, at *4 (Del. Aug. 14, 2000) (finding that "because Cook has not demonstrated that he was entitled to a 'missing evidence' jury instruction, Cook was not prejudiced by defense counsel's failure to request such an instruction").

[81] *Harrington v. Richter*, 562 U.S. 86, 112 (2011) ("The likelihood of a different result must be substantial, not just conceivable." (citing *Strickland*, 466 U.S. at 693)); *Baynum v. State*, 211 A.3d 1075, 1084 (Del. 2019) (stating that prejudice requires that there is "a substantial likelihood—i.e., a meaningful chance—that a different outcome would have occurred but for counsel's deficient performance").

conducted the defense as his lawyer did."[82]  There is a strong presumption that his

attorneys' representation was reasonable,[83] and "[i]t is not this Court's function to

second-guess reasonable . . . tactics" engaged by trial counsel.[84]  Indeed, an

attorney's strategic or tactical choices made after thorough investigation of the

relevant law and facts are virtually unchallengeable.[85]

Lead trial counsel explained first that he was aware that the initial location

of the cell phone—whether it was in Aloysius's hand, pocket, or elsewhere—was a

significant issue for Taylor's self-defense theory.[86]  But he elected not to highlight

the issue for the State nor prod further out of "concern that the State might call a

witness to specifically explain that the cell phone and other items had fallen out of

the victim's possession when they were moved, either by the EMT or one of the

initial officers."[87]  Because the State did not call such a witness, trial counsel was

free to argue in closing that the State had not shown that Aloysius's phone was in

his pocket, as opposed to in his hand—supporting the defense argument that

Taylor, in the heat of the moment, reasonably mistook Aloysius's phone for a gun

---

[82]  *Green*, 238 A.3d at 174 (citing *Kemp*, 483 U.S. at 791).

[83]  *Wright*, 671 A.2d at 1356.

[84]  *State v. Drummond*, 2002 WL 524283, at *1 (Del. Super. Ct. Apr. 1, 2002).

[85]  *Green*, 238 A.3d at 174.

[86]  Maurer Affidavit ¶ 6 (D.I. 100).

[87]  *Id.*

in his hand and felt compelled to shoot first.[88]  Trial counsel were each aware of the *Lolly/Deberry* case law and did not believe the State's lack of knowledge as to "how the items got to where they" ended up could possibly warrant a missing-evidence instruction request.[89]

Lead trial counsel knew the State failed to explain the travel of the cell phone and chose not to highlight it until closing so he could make his best self-defense argument then.[90]  And trial counsel understood well—as the Court has explained—*Lolly/Deberry* to be inapplicable here.[91]  As such, Taylor's trial attorneys' conduct can hardly be found to have been objectively unreasonable. Given that, Taylor has failed equally to satisfy *Strickland's* counsel-deficiency prong.  In turn, his ineffective assistance of counsel claim fails on that independent basis.

---

[88]  *Id.* ¶ 7; Wolpert Affidavit ¶¶ 3-4 (D.I. 101) (Ms. Wolpert was Taylor's second-chair trial counsel).

[89]  Maurer Affidavit ¶¶ 11-12; Wolpert Affidavit ¶ 5.

[90]  *See State v. Madison*, 2022 WL 3011377, at *3 (Del. Super. Ct. July 29, 2022) ("Trial counsel made a strategic decision when he chose not to seek such testing and that was a decision no court would be willing to disturb." (citations omitted)); *see, e.g., Drumgo v. State*, 2012 WL 1377596, at *2 (Del. Apr. 17, 2012) (trial counsel's strategic decision to forego DNA testing to protect client from possibly incriminating results and also provide the defense with an argument of insufficient evidence based on the prosecutor's failure to produce the test results was reasonable).

[91]  *State v. Peters*, 283 A.3d 669, 696 (Del. Super. Ct. 2022) ("Counsel cannot be ineffective for failing to make futile arguments." (cleaned up)), *aff'd*, 2023 WL 3880124 (Del. June 7, 2023).

## V. CONCLUSION

Taylor has proved neither the deficient performance by counsel nor the prejudice required for relief under *Strickland*. Accordingly, Taylor's Rule 61 postconviction relief motion is **DENIED**.

**IT IS SO ORDERED.**

**Paul R. Wallace, Judge**

Original to Prothonotary