REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 513

September Term, 2011

---

ON REMAND

---

ROBERT MITCHELL ACKER

v.

STATE OF MARYLAND

---

Eyler, Deborah S.,
Woodward,
Kehoe,

JJ.

---

Opinion by Kehoe, J.

---

Filed: September 30, 2014

Maryland Rule 5-802.1(b) permits the introduction of a witness's prior consistent statement as substantive evidence "if the statement is offered to rebut an express or implied charge against the declarant of fabrication, or improper influence or motive . . . ." The Court of Appeals has interpreted this rule to include a temporal restriction, namely, that a prior consistent statement is admissible under Rule 5-802.1(b) only if "it was made before the source of the bias, interest, influence or incapacity originated." *Thomas v. State*, 429 Md. 85, 101-02 (2012). The issue before us is how the restriction articulated in *Thomas* should apply in cases in which a party, in addition to a temporally-specific allegation of bias, makes bald assertions such as that the victim of alleged child sexual abuse was "starved for attention" and therefore is inherently unworthy of belief. We conclude that factually unsupported and conclusory allegations of bias or fabrication of the sort at issue in this appeal do not trigger the *Thomas* restriction.

The appellant in this case is Robert Mitchell Acker, who was convicted by a jury of the Circuit Court for Montgomery County of two counts of sexual offense in the third degree.[1] He appealed and a panel of this Court affirmed his convictions in an unreported opinion. *Acker v. State*, No. 513, September Term, 2011, filed April 5, 2012 ("*Acker I*"). As we will explain in greater detail, the Court of Appeals granted Acker's petition for writ of certiorari, summarily vacated the judgment, and remanded the case to us for reconsideration

---

[1]A third degree sexual offense is defined in Maryland to include: "engag[ing] in sexual contact with another if the victim is under the age of 14 years, and the person performing the sexual contact is at least four years older than the victim." Md. Code (2002, 2010 Supp.) § 3-307(a)(3) of the Criminal Law Article.

in light of *Thomas.* Upon reconsideration, we conclude that the trial court did not err in its evidentiary rulings and again affirm the convictions.

## Background

### A. The Trial

On July 11, 2010, K., at the time fifteen years old, called the Montgomery County Police and stated that she had been sexually abused by Acker on several occasions starting in 2003, when she was seven years old. Acker was eventually indicted on seven sex-related offenses, including multiple counts of sexual offense in the third degree. The case proceeded to a four-day trial by jury in the Circuit Court for Montgomery County.

A few days before trial commenced, the prosecution filed a motion in limine requesting that the trial court "make a pre-trial ruling on the admissibility of certain prior consistent statements [made by K.] to be offered by the State." In the motion, the prosecution asserted that the statements it intended to offer were admissible on several grounds, including pursuant to Rule 5-802.1(b). The court heard the motion outside the presence of the jury on the first day of trial. The prosecutor, at that time, repeated her request for "a pre-trial ruling on [the motion]" but stated, "I know it may end up becoming more of a ripe issue after the victim's testified. . . ." Defense counsel, in turn, agreed with the latter point, contending, "I think it's premature to make any judgment. We don't know what the evidence is going to be until we hear the evidence. . . ." The trial court agreed with defense counsel, concluding that, "once [the State is] in a position to call witnesses that would be [testifying

as to] prior consistent statements, then we can address it at that point."

The State's case rested on the credibility of K. She testified that, on several occasions between 2003 and 2005, Acker engaged in two different types of sexual contact with her. According to K., the alleged incidents of abuse occurred at her mother's house, after the family hosted parties which involved alcohol and illicit drug use among the adults in attendance. The guests at these parties, including Acker, often spent the night, sleeping on the floor or couch in the home's living room, in order to avoid driving under the influence of drugs, alcohol, or both.

K. testified that, at first, she did nothing in response to the ongoing abuse because "I didn't know what was happening," but that, eventually, she told several people about it in 2004 or 2005, including (in chronological order): Michael S., a neighborhood friend; Melissa, her mother; and Charlene C., her best friend from school.[2] According to K., she believed that Melissa had "gotten [Acker] in trouble" for abusing her until July of 2010, when she learned, during a heated verbal argument with her mother, that Melissa had not, in fact, called the police after learning of the alleged abuse. K. testified that she was upset that Melissa "didn't do anything," and that she "wanted something done [about the abuse]." As a result, K. called 9-1-1 two times: first, reporting that Melissa had "abus[ed]" her;[3] and

_____

[2] K. testified that she also told others about the abuse at later points in time. The trial court did not permit the introduction of evidence of these statements.

[3] The police did not respond to this first 9-1-1 call. Defense counsel, during cross-examination, asked K. if her intention in calling 9-1-1 on her mother was to "get the attention
(continued...)

3

second, reporting that Acker had "raped" her several years ago. (K. clarified that, when she told others that she had been raped by Acker, she meant that he had "violated" her or touched her inappropriately). K. further testified that, as a result of, among other matters, the 9-1-1 calls and Melissa's failure to report the abuse, she and Melissa "have a difficult time getting along with each other."

Defense counsel advanced three theories as to why K.'s testimony was unworthy of belief.[4] First, in opening statement, defense counsel attacked K.'s character, contending that K. had fabricated the alleged instances of abuse because she was "starved for attention," and, as a result, was "reaching out for attention" from both her mother and the world at large. Second, defense counsel asserted that K. had lied about the alleged abuse at the behest of her mother, Melissa, who felt "jilted" by Acker's refusal, in June of 2005, of what he perceived to be romantic overtures from her. Third, defense counsel maintained that K. had

_____

[3](...continued)
of the police to come talk to you[?]" K. responded in the affirmative. K.'s second 9-1-1 call was played for the jury. During that dialogue, K. asked the dispatcher, "[c]ould you send someone over to me?" The dispatcher responded by asking, "[w]hat do you need a police officer for?" to which K. replied, "there is this . . . whole [] situation that [] I need to [] tell about this one guy and me, that what happened," and "that my mom never told the cops on this one guy because he raped me for almost five years, and she never told the cops on him." K. clarified on cross-examination that the abuse continued, not for five years, but only between 2003 and 2005.

[4]As *Thomas* makes clear, "the alleged pre-statement motive to fabricate must have been 'raised in the case' [either] expressly or impliedly [] before the trial judge's determination as to the admissibility of the prior consistent statement." 429 Md. at 103 n.1. Here, defense counsel raised the theories of impeachment in his opening statement, and, thus, the alleged motives were clearly "raised in the case" prior to when the trial judge ruled on the admissibility of K.'s prior consistent statements.

4

fabricated the abuse allegations in order to assist Amy R., a family friend, who was involved in a lawsuit with Acker over a real estate transaction (the suit was filed in either late 2009 or 2010). As defense counsel summarized to the jury in his opening statement, "Mr. Acker's kind of caught up in this perfect storm. He has his worst enemies pursuing him through [K.] . . . a child struggling for attention . . . ."

In an attempt to rebut one or more of these charges of fabrication,[5] the State called Michael S., Melissa, and Charlene C. to testify, over Acker's objections, that K. had disclosed the alleged incidents of abuse to them in 2004 or 2005.[6] Michael S. stated that, although he could not remember K.'s exact words, she communicated to him that Acker had "touched her" and "did inappropriate things to her," and that, during these conversations, K. was "upset" and "crying." Melissa testified that K. "came to me and told me that [Acker] touched her one time" and that "he had put his hands on her when she was little." According to Melissa, at the time, K. was "really upset" and "it just kind of came out at the end of [a] discussion." Charlene C., in turn, testified that K. told her that "around from when she was 7 until 10, that she was being raped"—i.e., touched inappropriately—and that, during the conversations, K. was "upset" and, "several times, she would just randomly cry about it

[5]At trial, the State did not specify which of these charges of fabrication it was attempting to rebut by admitting K.'s prior consistent statements.

[6]The testimony established that K. did not disclose specific details of the abuse to these witnesses, nor did they testify as to such.

because nothing had been done."[7] The trial court admitted these prior consistent statements as substantive evidence under Rule 5-802.1(b), which, as noted above, requires that the statements be "offered to rebut an express or implied charge against the declarant of fabrication, or improper influence or motive[.]"

Acker testified in his own defense. He admitted that sexual contact had occurred on at least one occasion in 2004 or 2005, when he awoke one morning to find that K. was, in his words, "dry humping . . . my hand." But he denied any responsibility for the interaction, stating that it was K. who had initiated the inappropriate contact. As to the remaining incidents described by K., Acker testified that he had never sexually abused K. and that she was lying about the allegations.

After deliberating, the jury convicted Acker of two counts of sexual offense in the third degree and acquitted him of the remaining charges. Acker was sentenced to incarceration for a period of four years, all but eighteen months suspended, with eighteen months of supervised probation to follow upon his release. In addition, Acker was required to register as a sex offender.

### B. The Appeal

Acker appealed his convictions to this Court, arguing, in pertinent part, that the trial court erred in permitting Melissa, Charlene C., and Michael S. to testify regarding K.'s prior consistent statements about the alleged abuse. Applying the analysis set forth in *Thomas v.*

---

[7]As noted above, K. clarified that when she told others that she had been raped by Acker, she meant that he had touched her inappropriately.

6

*State*, 202 Md. App. 386 (2011), *rev'd*, 429 Md. 85 (2012), the panel affirmed Acker's convictions, holding that the prior consistent statements were admissible because they "were made prior to the existence of at least one of the potential motives to lie as argued by Acker—most notably, [K.'s] 9-1-1 call to police to elicit attention from her mother." Slip. Op. at 16.[8] Acker filed a petition for writ of certiorari in the Court of Appeals, presenting the following question:

> Did the Court of Special Appeals incorrectly apply Maryland Rule 5-802.1(b) when it held that if a declarant had multiple motives to fabricate, the declarant's prior consistent statement was admissible at trial so long as it predated at least one of the declarant's motives?

The Court of Appeals granted the petition and summarily vacated this Court's judgment and remanded the case to us "for further consideration in light of *Thomas v. State,* [429 Md. 85 (2012)]."

Upon remand, we ordered the parties to re-brief the relevant issues in light of *Thomas* and *Hajireen v. State*, 203 Md. App. 537, *cert. denied,* 424 Md. 306 (2012), a decision of this Court interpreting Rule 5-802.1(b).[9]

---

[8] Acker raised other issues in *Acker I*, namely, whether the trial court erred in admitting a pre-trial statement made to police detectives, whether the court should have ordered the State to file a bill of particulars, and whether the court erred in failing to exclude testimony as to a letter written by Acker to K.'s mother when neither an original nor a copy of the letter was available. These issues are not before us at this stage in the litigation.

[9] We posed the following questions to the parties:

1. In light of the Court of Appeals' analysis in *Thomas*, and this Court's opinion in *Hajireen v. State*, 203 Md. App. 537 (2012), did assertions by

(continued...)

7

## Analysis

There is no dispute that the prior consistent statements at issue in this appeal constitute hearsay and were inadmissible unless they satisfied the requirements of Rule 5-802.1(b) or another exception to the general prohibition against the admission of hearsay evidence. Our review of the trial court's rulings concerning the admission of hearsay evidence is *de novo. Thomas*, 429 Md. at 98; *Dulyx v. State*, 425 Md. 273, 285 (2012).

---

[9](...continued)
defense counsel that the victim was "reaching out for attention" or that the victim had "an oversized appetite for attention" from the time that she first made statements to others that she had been allegedly sexually assaulted by appellant constitute "the existence of any fact which would motivate bias, interest, or corruption on the part of the witness," *Thomas*, 429 Md. at 104-05, that would bar admission of evidence of all or some of such statements under Md. Rule 5-802.1(b)?

2. In light of the Court of Appeals' analysis in *Thomas*, and this Court's opinion in *Hajireen . . .* , is evidence (i) that the victim told her mother that she had been sexually assaulted by appellant or (ii) that the victim told friends in 2005-2006 that she had been sexually assaulted by appellant, admissible to rebut an impeachment that, in 2010, the victim was manipulated by the victim's mother and a friend of the mother to accuse appellant of sexually assaulting the victim?

3. Based on the record developed before the trial court, may this Court consider whether the victim's statements to her friends and her mother were "prompt report[s] of sexually assaultive behavior." *See* Rule 5-802.1(d) and *Gaerian v. State*, 159 Md. App. 527 (2004)?

4. If the answer to the previous question is "yes," would such a conclusion render harmless any error by the trial court in admitting the alleged victim's prior statements pursuant to Rule 5-802.1(b)?

In light of our analysis, it is not necessary to address the final two questions.

8

Acker maintains that the Court of Appeals' decision in *Thomas* "dictates . . . that once the defense has asserted [that] a witness has a motive to fabricate, any statements that follow are inadmissible as prior consistent statements so long as the original motive continues to exist." In Acker's view, the trial court erred in admitting K.'s prior consistent statements into evidence via the testimony of Michael S., Melissa, and Charlene C. We do not agree with Acker's proposed application of *Thomas* to the facts before us.

To reiterate, Acker argued that K. complained to the police about his alleged actions and then testified consistently with the details of her complaint for three distinct reasons: (1) that K. was angry at Acker because he had an ongoing lawsuit against a friend of K. and her family; (2) that K. complained to the police in the first instance because she was "starved for attention"; and (3) that she resented Acker because he had rebuffed romantic overtures from K.'s mother, overtures that Acker asserted had been made about the time he allegedly assaulted K.

We hold that evidence of K.'s prior consistent statements was properly admissible under *Thomas* to rebut Acker's first theory of impeachment because the statements were made prior to the dispute that led to the lawsuit with the family friend. We decline to accept Acker's argument that this otherwise admissible evidence should be barred because K. reported the alleged assaults to the police. Finally, we conclude that the temporal element of Acker's third theory of impeachment—that K. was motivated to lie because her mother had been rebuffed by Acker—is irrelevant to a *Thomas* analysis because there was no

evidence or argument suggesting that K. was so motivated at the time she made the statements to her mother and her friends that were admitted into evidence.

Because evidence of K.'s prior consistent statements were properly admitted to rebut Acker's first theory of impeachment, and the remaining two theories of impeachment did not affect the admissibility of those statements, we will affirm Acker's convictions for sex offense in the third degree.

We will begin our analysis by reviewing the Court's reasoning in *Thomas* itself. We will then consider *Thomas* in the context of other principles relevant to Rule 5-802.1(b) problems. We will then turn to Acker's specific contentions.

## II. *Thomas*: A Prior Statement Must Predate the Alleged Motive to Fabricate to Be Admissible under Rule 5-802.1(b)

The trial court admitted K.'s prior consistent statements as substantive evidence pursuant to Rule 5-802.1(b).[10] The rule provides in pertinent part:

> The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:
>
> . . .
>
> (b)   A statement that is consistent with the declarant's testimony, if the

---

[10] We recognize that child sex abuse prosecutions raise unique challenges to courts and counsel alike. *See, e.g., Tome v. United States*, 513 U.S. 150, 166 (1995) (observing that there are "difficulties attendant upon the prosecution of alleged child abuses"); John Myers, MYERS ON EVIDENCE OF INTERPERSONAL VIOLENCE CHILD MALTREATMENT, INTIMATE PARTNER VIOLENCE, RAPE, STALKING, AND ELDER ABUSE § 7.11 (2012) (identifying and discussing difficulties in applying certain evidentiary standards in child sex abuse prosecutions, including the rules applicable to prior consistent statements of a child abuse victim). However, Rule 5-802.1(b) focuses on the type of impeachment alleged, not on the capacity of the witness or the nature of the proceeding.

10

statement is offered to rebut an express or implied charge against the declarant of fabrication, or improper influence or motive[.]

Although Rule 5-802.1(b) is silent as to any temporal limitations, appellate courts in Maryland have held that prior consistent statements are admissible under this rule only if the prior statements were delivered "before the alleged fabrication or improper influence or motive arose." *Holmes v. State*, 350 Md. 412, 424 (1998). As the Court of Appeals explained in *Thomas*:

> In *Holmes*, we explained that Md. Rule 5-802.1(b) retains the common law "premotive" requirement. In other words, as a prerequisite to admissibility, a prior statement must predate the alleged motive to fabricate. Under the common law, if a witness is attacked by a charge of fabrication or improper influence or motive, the prior consistent statement is relevant only if it was made before the source of the fabrication or improper influence or motive originated.

429 Md. at 101-02 (citing *Holmes*, 350 Md. at 422).

In *Thomas*, the defendant was charged with distributing controlled dangerous substances. At trial, the State offered evidence that the defendant and a man named Benjamin had engaged in an exchange of drugs, money, or both, in a shopping center parking lot, before driving away. The State contended that the evidence at trial established that the defendant was the seller and that Benjamin was the purchaser. The defense presented the opposite theory, that it was Benjamin—not the defendant—who was the one distributing drugs. In support of the State's position, the prosecution called Benjamin to testify, as well as the two police officers who stopped Benjamin's vehicle and arrested him shortly after the exchange took place. Benjamin testified that he had purchased crack cocaine

11

from the defendant. Thereafter, the two police officers testified that, after pulling him over on the side of the road and discovering crack cocaine on his person, Benjamin told them that he had purchased the drugs from the defendant. Though opting not to present evidence of its own, the defense responded to this testimony by attacking the credibility of Benjamin during its cross-examination and closing argument. The jury ultimately convicted the defendant of distributing controlled dangerous substances.

On appeal to this Court, in *Thomas v. State*, 202 Md. App. 386 (2011), the defendant challenged the admissibility of the police officers' testimony as to the prior, out-of-court statements of Benjamin. The defendant argued that Benjamin had a motive to testify falsely and that this motive arose from two distinct events: first, that, upon the officers' discovery of crack cocaine on his person, he had a motive to lie to protect himself from drug distribution charges, and second, that he had a motive to testify falsely in court so that he would receive favorable treatment from the prosecution on unrelated charges involving his unauthorized use of a motor vehicle. 202 Md. App. at 393-94, 397-98. The police found the cocaine in Benjamin's possession before he made the out-of-court statements; but the unauthorized use situation arose after Benjamin made the statements. *Id*.

On appeal, the defendant contended that, pursuant to Rule 5-802.1(b), the trial court erred in permitting the police officers to testify as to Benjamin's pre-trial statements because they were made after at least one of the alleged motivations to lie arose. *Id*. at 394. This Court disagreed, holding that, under the rule, "a witness's prior consistent statement is

admissible if made prior to the existence of *any one of multiple biases or motives* that an opposing party charges, expressly or impliedly, might have influenced the witness's testimony." 202 Md. App. at 398 (emphasis added). Because the second of the two alleged motives to lie arose subsequent to Benjamin's making of the statements, we affirmed the trial court's evidentiary rulings. *Id*. at 400.

The Court of Appeals granted Thomas's petition for a writ of certiorari and came to a different conclusion. In *Thomas v. State*, 429 Md. 85 (2012), the Court held that, "when the witness is obviously under investigation or has been arrested when the [prior] statements were made, [those statements] are generally inadmissible because the motive to fabricate has already arisen." 429 Md. at 103 (citing 2 MCCORMICK ON EVIDENCE § 251, at 152 (Kenneth S. Brown ed., 6th ed.2006)). Applying the rule to the facts before it, the Court concluded that the trial court erred in permitting the police officers to testify about Benjamin's prior statements because "Benjamin made the statements after he was stopped by police and under investigation for his alleged participation in [the] drug transaction." *Id*. at 106. As the Court observed, "Benjamin had a motive to fabricate his story the moment he knew he was under investigation and/or stopped by the police on suspicion of participating in a drug transaction." *Id*. at 107. Therefore, "his prior consistent statements were inadmissible because the motive to fabricate, as alleged by [the defendant], had already arisen." *Id*. at 106.

In so holding, the Court articulated the following generally applicable standard for purposes of applying Rule 5-802.1(b): "[i]f the prior consistent statements were made at a

time prior to the existence of any fact which would motivate bias, interest, or corruption on the part of the witness then the prior consistent statements are admissible to rebut the alleged bias or interest," but, "[c]onversely, statements made when the declarant had an alleged motive to falsify are not relevant [and thus not admissible] to rebut a charge of fabrication." 429 Md. at 104-105. As the Court noted, "[t]he timing of the alleged fabrication is crucial to the application of Md. Rule 5–802.1(b)," and, therefore, "the trial court's focus should be on when the prior consistent statements arose." *Id*. at 104.

### III. The Finite Scope of Rule 5-802.1(b)

As the Court of Appeals made clear in *Thomas*, "under Md. Rule 5–802.1(b) a prior consistent statement may not be admitted to counter all forms of impeachment or to bolster the witness merely because [he or] she has been discredited." 429 Md. at 102 (quotation marks and citations omitted). Instead, the rule is "'intended to permit the admission of those prior consistent statements which would logically rebut the impeachment undertaken, whether by an implied or express charge of fabrication or of bias or improper motive.'" *Id.* at 103 (quoting *Holmes*, 350 Md. at 423). To rebut the charge of fabrication, the out-of-court statement must have been made prior to the occurrence of facts or events that gave rise to the alleged motivation to fabricate. Such events may be, for example: an investigatory stop or arrest of the witness, *id*. at 103; the witness's commission of a crime, *Blair v. State*, 130 Md. App. 571, 601 (2000); *McCray v. State*, 122 Md. App. 598, 609–10 (1998); the witness's formulation of a "'plan or contrivance to give false testimony,'" *Cole v. State*, 83 Md. App.

14

279, 301 (1990) (quoting MᴄCᴏʀᴍɪᴄᴋ ᴏɴ Eᴠɪᴅᴇɴᴄᴇ § 49 (E. Cleary 3d ed. 1984)); or a "change of circumstances" arising from the witness's role in a financial or other type of "transaction." *Baltimore City Pass. Ry. Co. v. Knee*, 83 Md. 77, 78-79 (1896). Put another way, these cases stand for the proposition that Rule 5-802.1(b) is not an avenue for the admission of a witness's consistent out-of-court statement unless the statement is introduced to rebut an impeachment based upon a specific event which is the source of the witness's motivation to fabricate. *See, e.g., Thomas*, 429 Md. at 104; *Knee*, 83 Md. at 78-79; *Cole*, 83 Md. App. at 300.

That such a factual predicate is necessary before invocation of Rule 5–802.1(b) is consistent with the landmark Supreme Court decision on this subject. In *Tome v. United States*, 513 U.S. 150 (1995), the Supreme Court observed:

> Impeachment by charging that the testimony is a recent fabrication or results from an improper influence or motive is . . . capable of direct and forceful refutation through introduction of out-of-court consistent statements that predate the alleged fabrication, influence, or motive. A consistent statement that predates the motive is a square rebuttal of the charge that the testimony was contrived as a consequence of that motive.

513 U.S. at 157-58 (interpreting Federal Rule of Evidence 801(d)(1)(B)); *see also, Holmes*, 350 Md. at 419 (quoting and adopting this reasoning, and applying it to Md. Rule 5–802.1(b)).

*Tome* provides an apt illustration of these principles. The issue in *Tome* was "whether out-of-court consistent statements made after the alleged fabrication, or after the alleged

15

improper influence or motive arose, are admissible under [Fed. Rule Evid. 801(d)(1)(B)]."[11]

513 U.S. at 152. At trial, Tome—the father of the victim—contended that she had "concocted" the abuse allegations in order to effectuate a change in custody to her mother. (Tome and the victim's mother had divorced approximately two years prior, and Tome had been awarded primary physical custody of the victim in that proceeding). *Id*. at 153. The prosecution, in support of its case, presented several witnesses who recounted prior consistent statements made by the victim about the abuse. *Id*. at 154. There was no dispute that the out-of-court statements had been made after the specific event which had allegedly motivated the victim to fabricate her allegations—namely, the change in the victim's custody arrangement following her parents' divorce. *Id*. at 154-55. In its analysis, the Supreme Court emphasized that the victim's prior consistent statements had been made after she had been placed in Tome's custody. *Id*. at 153-55, 57-58. The Court concluded that admission of the

---

[11]Fed. Rule Evid. 801(d)(1)(B) provides:

d) **Statements That Are Not Hearsay.** A statement that meets the following conditions is not hearsay:
> (1) **A Declarant-Witness's Prior Statement.** The declarant testifies and is subject to cross-examination about a prior statement, and the statement:
> ***
> (B) is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying[.]

Rule 5-802.1(b) was derived, in part, from Federal Rule of Evidence 801(d)(1). *See Holmes*, 350 Md. at 418.

out-of-court statements as substantive evidence violated Rule 801(d)(1)(B)'s temporal restriction—i.e., failed to rebut the impeachment because they had been made after the motivating event had occurred—and reversed and remanded the case for further proceedings. *Id.* at 165-67.

In *Cole*, *supra*, this Court applied similar reasoning in a sex offense case relying on Maryland's evidentiary rules as they existed under the common law (the Maryland Rules of Evidence did not take effect until July 1, 1994). At trial, defense counsel attempted to impeach the victim's credibility by asserting that she was cognitively impaired and had "a tendency to exaggerate in order to attract attention." 83 Md. App. at 301. This impeachment was based on the testimony of a social worker who had interviewed the victim about prior complaints of sexual assault. He testified that the victim had cognitive disabilities and had made statements during the course of the prior interviews that he did not find to be accurate. *Id.* at 285. To rebut this impeachment, the prosecutor elicited from two witnesses testimony about prior consistent statements made by the victim concerning the alleged abuse. *Id*. We concluded that the statements violated the common law's temporal restriction. *Id*. at 302. In so concluding, we explained that:

> [t]he problem with the attempted rehabilitation was that [the victim's] conditions and tendencies preceded [her prior] complaints [of abuse]. The developing of these conditions and tendencies was not an intervening event between [her] complaints [of abuse] and [her] trial testimony. The consistency of [the victim's] reports and [her] testimony under this sequencing did not rehabilitate her testimonial credibility.

*Id*. at 301-02.

## IV. Acker's Three Theories of Impeachment

As noted above, defense counsel alleged three distinct theories of impeachment against K. in his opening statement. First, defense counsel argued that K. was motivated to testify falsely about Acker because of his involvement in a lawsuit against Amy R., a family friend of K.'s. Second, counsel maintained that K. was unworthy of belief because she was "starved for attention." Finally, defense counsel contended that K. was acting in concert with Melissa, her mother, to punish Acker because he had spurned Melissa's romantic overtures years previously. We will discuss each of these theories of impeachment in turn.

### (1) The Lawsuit with Amy R.

In opening statement (and periodically referenced throughout the trial), defense counsel asserted that K. was motivated to fabricate her abuse story as a result of Amy R.'s ongoing lawsuit with Acker over a real estate transaction. Acker testified that his dispute with Amy R. arose after he sold her a house, which, according to Acker, occurred approximately one year prior to his criminal trial. In our view, this impeachment was "capable of direct and forceful refutation through introduction of out-of-court consistent statements that predate the alleged fabrication, influence, or motive." *Tome*, 513 U.S. at 157-58. Because "[t]he timing of the alleged fabrication is crucial . . . the trial court's focus should be on when the prior consistent statements arose." *Thomas*, 429 Md. at 104. Although the record does not disclose the precise date the civil suit was filed, the trial transcript is sufficiently clear that the lawsuit commenced in either 2009 or 2010, upwards

of five years after K. disclosed the alleged abuse to Michael S., Melissa, and Charlene C. in 2004 or 2005.

Had Acker asserted only this theory of impeachment, *Thomas* would not bar admission of the prior statements because the event that allegedly motivated K. to fabricate her testimony occurred after K. made the out-of-court statements. 429 Md. at 104.

### (2) K. Was "Starved for Attention"

In his opening statement, Acker's counsel asserted that K. was not credible because she was "starved for attention." To this Court, he argues:

> [s]imilar to the defense in *Thomas* that alleged the declarant had a motive to fabricate throughout due to his having been stopped by police in possession of illegal drugs, here, the defense alleged the victim had a motive to fabricate throughout: her desire to seek attention. That motive never disappeared and any of the statements she made that were admitted at trial all occurred when the motive existed. Under *Thomas*, that she may have later developed an additional motive, the same way the declarant in *Thomas* developed an additional motive when he incurred the unauthorized [vehicle] use charge, does not make her statements inadmissible. It is immaterial that the victim in this case may have had more than one motive to fabricate her testimony so long as she had any motive to fabricate at the time the statements were made.

We are not persuaded that Acker's analogy to *Thomas* is valid.

The record contains no specific assertions about, much less evidence of, any emotional or psychological abnormality on K.'s part. Instead, Acker argued that K.'s 2010 report of the alleged abuse to the police showed that she was, in his counsel's word's, "starved for attention."[12] This entirely circular reasoning does not, in our view, establish a

---

[12]K. testified that she called the police when she learned that her mother had failed

(continued...)

"fact which would motivate bias, interest, or corruption on the part of the witness . . . ." *Thomas*, 429 Md. 104. Moreover, Acker's argument is based on the unspoken, but necessary, premise that any victim who reports a crime to the police is thereafter motivated to fabricate. There is no basis, either in law or logic, for such a conclusion. Finally, accepting Acker's argument for purposes of analysis, it at best suggested that K. had a motive to fabricate when she called the police in 2010. This is a far cry from establishing that she had that same motive years earlier, when she made the statements to her two friends and her mother.

We conclude that reporting a crime, by itself, is not an event that "would motivate bias . . . . on the part of the witness," *Thomas*, 429 Md. 104, nor is it the type of circumstance that might logically give rise to a "'plan or contrivance to give false testimony[.]'" *Cole*, 83 Md. App. at 301 (quoting McCormick on Evidence § 49)). In other words, for the purposes of *Thomas's* temporal relationship test, reporting an alleged crime to the police is simply a non-event that does not require a trial court to apply the *Thomas* test before deciding whether to admit a prior statement through Rule 5-802.1(b).

Acker's attempt to characterize K.'s calls to the police as demonstrating a character abnormality does not change the result. Were we to agree with Acker, any trial counsel who was planning to impeach a victim in a criminal trial based on a motive to fabricate arising out of a specific event could foreclose the admission of prior consistent statements pursuant to

---

[12](...continued)
to take any action in response to K.'s earlier disclosures of abuse. This is not a basis to conclude that she was starved for attention.

Rule 5-802.1(b) simply by asserting, as was done in this case, that a witness possesses certain natural and inherent human traits or desires, such as wanting attention from his or her mother. A single sentence in an opening statement would render Rule 5–802.1(b) a dead letter.

### (3) The Rebuffed Overtures

Defense counsel contended at trial that K. was motivated to lie about the alleged abuse because her mother felt "jilted" by Acker's refusal of her romantic advances. There is an obvious weakness—whether or not Melissa resented Acker's alleged rebuff, the witness whom Acker sought to impeach was K. For the following reasons, we believe that this impeachment is irrelevant for a *Thomas* analysis.

There was conflicting evidence presented at trial as to Melissa's relationship with Acker. He testified that he had refused what he perceived to be Melissa's romantic gestures toward him by writing a "it's me, not you breakup letter," which, according to him, he sent to Melissa sometime during the latter part of June 2005.[13] Melissa, on the other hand, testified that she never made any romantic gestures toward Acker, that she was never romantically interested in him, and that the letter sent by Acker was an apology for his actions toward K. Melissa testified that she stopped talking to and socializing with Acker from June 2005 onward, that is, after K. told her that Acker had abused her. Melissa further testified that, during the weeks that followed, Acker tried multiple times to contact the family via telephone and internet, until finally opting to mail the handwritten apology letter.

---

[13] This letter was not introduced at trial. The evidence indicated that Melissa lost or destroyed it at an undetermined time after receiving it.

All of this provides a basis for an impeachment of *Melissa's* credibility but Rule 5-802.1(b) indicates that the alleged motive to fabricate must belong to the declarant, and not some other person. *Thomas* makes it clear that, when a witness's motive to lie could stem from more than one event, the witness's prior consistent statements are admissible under the rule only if they were made prior to all of the events that could have given rise to the motive to fabricate. 429 Md. at 106-07. Thus, the relevant event for purposes of a *Thomas* analysis is not when Acker allegedly rebuffed Melissa's advances, but when Melissa allegedly informed K. of the rebuff.

Under *Thomas*, Acker's third theory of impeachment would preclude admission of K.'s prior statements to rebut the Amy R. impeachment only if something like the following sequence of events was presented to the jury either by opening statement, cross-examination, or evidence: (1) Melissa made romantic overtures to Acker in 2005; (2) he rejected them; (3) Melissa told K., then aged ten, of the first two events; (4) K. developed a resentment of Acker because he refused to engage in an illicit relationship with her mother and thus formed a motive to lie; and (5) acting on this motive, K. told her mother and two friends that she had been abused but waited five years before calling the police. Perhaps wisely, Acker's counsel made no attempt at trial to elicit information from K. or any other witness pertaining to steps (3) through (5). At no point during the trial did Acker identify any fact or event that supported his contention that Melissa, angry at being rejected by Acker, confided in her ten year old daughter. We conclude that because of its utterly illogical nature, Acker's third

22

theory of impeachment does not constitute "the existence of any fact which would motivate bias, interest, or corruption on the part of [K.]" *Thomas*, 429 Md. at 104.

## V. *Hajireen v. State*

We turn, finally, to *Hajireen v. State.* In that case, the defendant was accused of sexually assaulting an eight-year-old girl. Defense counsel suggested to the jury (as summarized by this Court) that the girl "was making up stories" and "made up the entire incident, from the beginning when she told her mother." 203 Md. App. at 554. The trial court permitted the State to introduce evidence of prior statements made by the victim under two theories, first, that the statements "were offered to rebut an express . . . charge . . . of fabrication . . . ." (Rule 5-802.1(b)); and, second, that the prior statements were rehabilitative under Rule 5-616(c)(2).[14] We held that the child's "subsequent statements to the social worker were not made prior to the time the alleged, but unexplained, bias originated" and that, "[b]ecause her statements were not made 'premotive,' they were not admissible pursuant to Rule 5-802.1." *Id.* at 554. We explained:

> the trial court found that J. M.'s prior statements to the social worker were admissible pursuant to Rule 5–802.1 because defense counsel suggested to the jury that J. M. was making up stories, and therefore, the evidence was

[14]Rule 5-616 states in pertinent part:

(c) Rehabilitation. A witness whose credibility has been attacked may be rehabilitated by:

\* \* \* \*

(2) Except as provided by statute, evidence of the witness's prior statements that are consistent with the witness's present testimony, when their having been made detracts from the impeachment[.]

"admissible to rebut an implied or express charge of fabrication." Defense counsel's argument, however, was that, for reasons unknown, J. M. made up the entire incident, from the beginning when she told her mother. J. M.'s subsequent statements to the social worker, therefore, were not made prior to the time the alleged, but unexplained, bias originated

*Id.*[15]

Acker contends that *Hajireen* establishes that the trial court erred in admitting K.'s prior consistent statements into evidence. We disagree.

In *Hajireen*, the defendant presented only one theory of impeachment. Thus, in that case, we did not reach the question squarely before us here: whether Rule 5-802.1(b)'s temporal restriction acts to bar the admission of prior consistent statements otherwise properly admissible under the rule because defense counsel also alleged additional theories of impeachment that were based solely on bald and conclusory statements by counsel and that had no logical or factual relationship to the evidence presented to the jury. We answer that question in the negative.

**THE JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY ARE AFFIRMED. APPELLANT TO PAY COSTS.**

---

[15] In *Hajireen*, although we addressed and rejected the State's contention that the prior consistent statements at issue were admissible pursuant to Rule 5-802.1(b), we focused our analysis on the question whether the statements were alternatively admissible under Rule 5-616(c)(2). We concluded that they were not. *See* 203 Md. App. at 554-558.